IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES J. DAVIS,

                Plaintiff,                        OPINION AND ORDER

v.

                                           14-cv-617-wmc

WILLIAM GEE,

                Defendant.

---

In this civil action, *pro se* plaintiff James J. Davis claims that defendant William Gee, a correctional sergeant supervisor at the Columbia Correctional Institution ("CCI"), violated his rights under the Eighth Amendment by acting with deliberate indifference to prevent his substantial risk of attempted suicide. After denying the parties' cross-motions for summary judgment on different grounds, this court gave plaintiff an opportunity under Fed. R. Civ. P. 56(f) to show why his case should not be dismissed for lack of evidence proving the objective prong of his claim. (Dkt. #73.) After reviewing both parties' submissions in response to the show cause order, the court concludes that plaintiff has failed to show any genuine dispute of material fact on the objective prong of his deliberate indifference claim. Accordingly, the court will grant summary judgment to defendant.

FACTS[1]

---

[1] The following is an abbreviated version of the essential, undisputed and disputed facts viewed in a light most favorable to plaintiff for purposes of the court's Rule 56(f) order. A more detailed summary of the facts of this case can be found in the court's original summary judgment decision. (Dkt. #70, at 2-3.)

1

## A. Background

On March 13, 2014, plaintiff James Davis (1) showed Sergeant Gee a handful of pills, (2) said he was feeling suicidal and (3) asked to be placed on observation status. Davis further claims that Gee looked at the pills and responded "sarcastically," asking if he wanted "some Vaseline with that." Davis claims he then began to scream that he was about to overdose on the pills and commit suicide, but Gee ignored Davis, leaving without taking the pills away or attempting to help. Davis then took the pills, and he was ultimately taken to the emergency room at a local hospital for treatment for an attempted suicide.

Following limited discovery, defendant moved for summary judgment only with respect to the *subjective* prong of plaintiff's deliberate indifference claim, averring that plaintiff neither showed him any pills nor said he was suicidal. Given the parties' genuine, material factual disputes regarding what plaintiff actually said to defendant, this court denied the parties' cross motions for summary judgment on September 15, 2016. (Dkt. #70.) The court also noted, however, that defendant had proposed seemingly undisputed evidence calling into question whether plaintiff could prove the objective prong of plaintiff's Eighth Amendment claim -- that he actually faced a substantial risk of serious harm to his health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). In particular, defendant had submitted hospital test results showing that plaintiff ingested only a small amount of Tylenol on the date in question, so small that it was insufficient to pose a risk of harm. The same hospital records also showed that when plaintiff was admitted, he showed *no* signs of distress or concern, and further that when discharged, he did not require any significant treatment or follow-up. In his response to defendant's

2

motion for summary judgment, plaintiff did not dispute any of this evidence, nor the accuracy of the hospital records, including the conclusion by his primary care physician at CCI that "Davis suffered no serious injury as a result of the alleged overdose." (*See* Plt.'s Resp. to DPFOF ¶ 41.)

In light of this undisputed evidence, the court invoked its authority under Rule 56(f) to grant summary judgment after "giving notice and a reasonable opportunity to respond," on "grounds not raised by a party" or to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." The court then scheduled a telephone conference, notifying plaintiff to be prepared to discuss his theory and evidence regarding the objective prong of his deliberate indifference claim.

That telephone conference was held on October 5, 2016, at the conclusion of which the court directed the parties to submit briefing on the objective prong of plaintiff's deliberate indifference claim. In particular, the court ordered briefing on the following issues: (1) whether plaintiff has sufficient evidence to show that he faced a "substantial risk of serious harm" on the relevant date; (2) whether plaintiff can proceed with his deliberate indifference claim based solely on a risk of psychological harm; (3) if so, whether plaintiff has evidence that he faced a "substantial risk of serious" psychological harm; and (4) whether plaintiff has sufficient evidence from which a jury could find that he suffered a physical injury. Based on the parties' additional submissions, the court makes the following material findings of fact, which are undisputed except as noted.

## B. Facts Relevant to Objective Prong

After reporting that he had swallowed a handful of pills on March 13, 2014, Davis

was taken to the institution's HSU for treatment. Based on Davis's report, his primary care provider, Dr. Karl Hoffmann, then ordered that plaintiff be taken to Divine Savior Healthcare's emergency room for blood and urine toxicology screenings to determine what and how many, if any, pills plaintiff had ingested and the proper response to the possible overdose.

Defendant has now submitted all of plaintiff's records from his stay at Divine Savior, which show that he was admitted at approximately 1:30 pm and discharged at approximately 9:00 pm. (Dkt. #47-2 at 10.) During his time at the hospital, Davis's vital signs were monitored continually and showed no signs of abnormality or concern. The nurse notes from the hospital report that, at the time of intake at 1:41 pm, Davis "appears to be in no apparent distress" and "denies pain." He had an IV established and was provided with one liter of normal saline along with 1 g/kg of charcoal.

Davis was assessed again at 1:50 pm, and nurse notes state that he "appears comfortable, well nourished, well groomed" with "no deficits noted." (*Id.* at 16.) At a 3:00 pm "reassessment," there were "[n]o changes from previously documented assessment," and it was reported that "[p]atient denies pain at this time." There were still no changes reported in the nurse's notes at 4:30 pm. (*Id.*) On the contrary, the notes stated that plaintiff was "awake, alert and in no acute distress" and "negative" for fever, chills, injury, pain, nausea, diarrhea or shortness of breath. (*Id.*) At 5:31 pm, Davis was still "asymptomatic" with no complaints of pain. (*Id.* at 20.) Likewise, at 5:57 pm and 8:42 pm, the nurse again reported that "[p]atient appears in no apparent distress at this time." (*Id.*) Unsurprisingly, Davis was ultimately discharged at 9:03 pm, with a note that his

"condition [i]s stable" and "symptoms are unchanged," and an instruction that he follow up with CCI medical staff as needed. (*Id.* at 24.)

The hospital also administered labs, including complete blood count, metabolic panel, serum alcohol, serum asprin, serum Tylenol levels and urine toxicology screenings to screen for drugs that are considered dangerous.[2] While the test results indicated that Davis had Tylenol in his system, none of the other drugs screened were present.

According to Davis's primary care provider, Dr. Hoffman, Tylenol toxicity is determined by the concentration of Acetaminophen in the bloodstream at various time intervals after ingestion. At two hours post ingestion, a therapeutic range of Acetaminophen concentration is between 3 and 30 ug/dL. At 4 hours post ingestion, greater than 150 ug/dL is considered toxic. Plaintiff's first screening for Acetaminophen toxicity was collected at approximately 2:03 pm and showed a concentration of 17 ug/dL, well within the therapeutic range. His second screening was completed approximately 4 hours post ingestion and showed a concentration of 29 ug/dL, still well within the therapeutic range.

Although Davis conceded the accuracy of these hospital records, as well as Dr. Hoffman's analysis, in his original response to defendant's motion for summary judgment (dkt. #64, ¶¶ 37-41), he now purports to dispute their accuracy, stating that the progress notes and toxicological reports from Divine Savior were somehow "falsified." In particular, Davis now maintains that he told the nurses and doctors at the hospital that he was

---

[2] Plaintiff was screened for acetaminophen, alcohol, salicylate, benzo, PCP, amphetamines, methamphetamine, cocaine, buprenorphine, oxycodone, propoxyphene, THC, opiates, barbiturates, TCA and methadone. (Dkt. #47-2 at 5.)

experiencing stomach pain, dizziness and shortness of breath, but that they denied him treatment and discharged him anyway. He also submits declarations from three other inmates who allege that Divine Savior is in a conspiracy with the DOC and has falsified their toxicology reports in the past. (Dkt. ##84, 85, 89.)

Upon returning to the prison, Davis was again seen by HSU staff. His vital signs were recorded and a note was added to follow up with PSU. Davis was also placed on clinical observation, where he remained for 10 days, until March 24, 2016. Clinical observation is a non-punitive status that allows staff to more closely monitor an inmate that presents a danger to himself or others.

On March 15, 2016, two days after returning from Divine Savior, Davis was seen in the dayroom of the observation unit after an altercation with staff. Davis apparently indicated that he had ingested three, one inch pieces of a rubber segregation pencil and that he had been biting his forearm. On March 17, he was seen in the HSU. The progress notes from this visit state that Davis reported that he was suicidal, had not eaten since he returned from the hospital and had only been sipping water since he swallowed the pencil pieces. (Dkt. #79-1 at 4.) A progress note from the following day, March 18, states that security staff reported that Davis ate dinner on March 17 and breakfast on March 18 (*id.*), but he denies eating anything. Later on March 18, Davis stole medication from the medication cart. This time, he was monitored for symptoms, but was not taken to the hospital.

On March 20, 2014, Davis reported swallowing the top of his toothpaste cap, resulting in his throat hurting. Davis says that he was in such pain from swallowing the

6

cap that he could not speak or swallow, although the contemporary nursing notes state that Davis was able to speak and swallow "without difficulty."

OPINION

As the court previously noted, for Davis to prevail on his claim that defendant violated the Eighth Amendment by failing to stop him from overdosing, plaintiff must prove that defendant was deliberately indifferent to an objectively serious risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). Until the court identified the question whether plaintiff had faced a substantial risk of serious harm, plaintiff (and perhaps defendant) seemed to believe that defendant could be liable under the Eighth Amendment solely because he did not prevent plaintiff from swallowing a "handful" of Tylenol pills. However, that appears too broad a reading of the Eighth Amendment.

Certainly, prison staff has a duty to prevent inmates from causing serious harm to themselves, *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014), but ingesting pills -- even several pills -- does not necessarily create a substantial risk of serious harm protected by the Constitution. *See, e.g., Lindsay v. Runice*, Case No. 16-C-75 (E.D. Wis. Apr. 10, 2017) ("The mere fact that someone ingests seven pills — which could include aspirin, ibuprofen, iron, vitamin C, antacids, or any number of other kinds of pills — does not, in and of itself, create an injury of constitutional proportions.") To show a constitutional violation, there must be evidence that taking the pills presented an "objectively, sufficiently serious" risk of "serious damage to his future health." *Farmer*,

511 U.S. at 834. As the Seventh Circuit has explained, even if prison staff responds "wholly inappropriate[ly]" to a prisoner's report of a serious medical need, the prisoner cannot succeed on an Eighth Amendment claim unless there is evidence that the medical need was *actually* serious. *See Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

For example, in *Langston*, a prisoner told a guard that he had been raped and needed medical attention, but the guard refused to pass along his request to medical staff. An hour later, a medical technician making rounds arranged for the prisoner to be transferred to the local emergency room for treatment. *Id.* at 1236. The prisoner sued the unresponsive guard for deliberate indifference, but the prisoner submitted no medical evidence at summary judgment showing that he had suffered any "detrimental effect caused by the one hour between the time [he] notified [the guard] and the time he notified the medical technician." *Id.* at 1240. Additionally, there was "no evidence that as a consequence of the assault [the prisoner] suffered from a serious injury which required immediate treatment." *Id.* Instead, "when a doctor examined [the prisoner] later that morning he found no active bleeding and no rectal tear; [the prisoner] was diagnosed with an external hemorrhoid and microscopic amounts of blood." *Id.* at 1241. Therefore, "[n]o matter his motives," the guard's "failure to obtain immediate medical care for [the prisoner]" did not constitute an Eighth Amendment violation. *Id.* ("If Langston was raped, as he claims . . . Lt. Clark's response was wholly inappropriate. But that alone does not make it a constitutional violation."); *see also Jackson v. Pollion,* 733 F.3d 786, 790 (7th Cir. 2013) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather

8

than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."); *Simpson v. Suliene*, 340 Fed. Appx. 331, 333-34 (7th Cir. 2009) (plaintiff's "failure to show that he needed any treatment at all . . . therefore dooms his suit").

To succeed on his claim in this case, therefore, Davis needed to submit some objective evidence showing that defendant Gee's failure to intervene and prevent Davis from swallowing pills actually caused an objective risk of "serious damage to his future health." In directing the parties to brief whether plaintiff could show that he faced an "objective risk of serious harm," the court identified two possible types of harm: (1) psychological harm, resulting from a suicide attempt that was ignored; or (2) physical harm, resulting from the actual or potential physical effects of an overdose. The court invited plaintiff to provide evidence of either type of harm. In his supplemental briefing, plaintiff does not argue that his claim is based on a substantial risk of psychological harm; rather, all of his evidence and argument appear to rest on his claim that he faced a substantial risk of serious physical injury or death as a result of overdosing on an unknown amount of medication. As proof, Davis points to his allegations that he had stomach pains, dizziness, shortness of breath and difficulty eating and sleeping as evidence of the substantial harm caused by Gee's inaction.

However, plaintiff is well past the allegation stage. Summary judgment is the time for a plaintiff to "put up or shut up," *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010), and even a *pro se* plaintiff cannot stand on mere allegations in the face of

9

overwhelming medical evidence to the contrary. *See, e.g., Walker v. Shansky*, 28 F.3d 666, 672 (7th Cir. 1994) ("Walker's self-serving conclusions about his mental health are insufficient to withstand the defendants' motion for summary judgment.... [T]here is no evidence that Walker is qualified to testify as to his medical condition."); *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) ("Kayser's self-diagnosis alone cannot establish that he does, in fact, suffer from kidney stones ...."); *Cranford v. Henderson*, 2008 WL 538485, *7 (C.D. Cal. 2008) (plaintiff's own assertion that he suffered a heart attack was not sufficient to create a triable issue of fact). For this reason, the court concludes that plaintiff has failed to come forward with sufficient evidence for a reasonable jury to find in his favor on the objective prong of his claim.

As an initial matter, plaintiff has not explained the obvious contradictions between his responses to defendant's proposed findings of fact on summary judgment -- essentially conceding a lack of evidence that he suffered *any* injury -- and his supplemental submissions now purporting to dispute the accuracy of all of the hospital records, as well as Dr. Hoffman's analysis of those records. Perhaps plaintiff believed he did not need to dispute defendant's proposed findings of fact, since defendant had not moved for summary judgment on the objective prong of plaintiff's claim, but even giving plaintiff the benefit of the doubt, his most recent submissions are insufficient to show a genuine factual dispute regarding the accuracy of the hospital records.

In an attempt to dispute the objective medical evidence, plaintiff further alleges that all of his medical records relevant to the incident have been falsified. He, and three other inmates, go even further by suggesting that there is a conspiracy between the Divine Savior

Healthcare and CCI to falsify inmate medical records in order to protect both entities from liability. But these allegations are also based on little more than speculation, which is insufficient to manufacture a genuine issue of fact at summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). In particular, plaintiff's theory would require the jury to believe that the numerous nurses, doctors and lab technicians who provided care to plaintiff at a private hospital all colluded, along with staff at CCI, to falsify plaintiff's medical records and deny him treatment. Based on plaintiff's and other inmates' assertions alone, no reasonable jury would reach that conclusion. *See also Scott v. Harris*, 550 U.S. 372, (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Nor is plaintiff's own declaration sufficient to create a triable issue of fact. Plaintiff alleges that he suffered from severe stomach pain, shortness of breath and dizziness, but *none* of these symptoms is noted in his hospital medical records, nor even in the HSU report. Not only are none of these symptoms noted, but the hospital records flatly deny that plaintiff presented with *any* of these symptoms. Even if a jury were to believe that plaintiff suffered from these symptoms *after* returning to CCI, plaintiff has offered no evidence from which a jury could conclude that the symptoms were caused by the pills he allegedly swallowed after showing them to the defendant. Although plaintiff alleges that the stomach pain and dizziness were *caused* by the pills, all of the objective medical evidence is to the contrary, and again plaintiff is not qualified to reach his own medical diagnosis.

11

In sum, the objective medical evidence shows that the amount and the relatively benign nature of pills plaintiff took created no objective risk of serious harm. Rather, plaintiff took a non-toxic amount of Tylenol in his system, causing by his own admissions to medical staff at the time, no pain, no significant symptoms *and* no treatment. Thus, there is no evidence that plaintiff suffered any objective risk of serious harm protected by the U.S. Constitution. Accordingly, plaintiff cannot sustain an Eighth Amendment deliberate indifference claim, and defendant is entitled to summary judgment.

ORDER

IT IS ORDERED that the clerk of court is directed to enter judgment in favor of defendant William Gee and close this case.

Entered this 6th day of July, 2017.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge